## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| SEAN BURT and LOGAN THOMSON, individually and on behalf of all others similarly situated, <br>    Plaintiffs, <br><br> v. <br><br> BOARD OF TRUSTEES OF THE UNIVERSITY OF RHODE ISLAND, <br>    Defendant. | C.A. No. 1:20-cv-00295-JJM-LDA <br> C.A. No. 1:20-cv-00465-JJM-LDA |

### MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Before the Court is Defendant Board of Trustees of the University of Rhode Island's ("URI" or the "University") Motion for Summary Judgment. ECF No. 69.

## I.    BACKGROUND

This case represents one of many previously consolidated actions (for ruling on their motions to dismiss) in which students alleged that various Rhode Island universities' decisions to transition from in-person to remote academic experiences in response to the COVID-19 pandemic breached the contract that exists between student and university under Rhode Island law. *See Burt v. Bd. of Trustees of Univ. of R.I.*, 523 F. Supp. 3d 214 (D.R.I. 2021). Here, two students, Sean Burt and Logan Thomson, seek to recover from URI three types of fees for themselves, and ultimately

a whole class of students at the University.[1]  ECF No. 1 (20-465); ECF No. 22 (20-295).  These fees are the: Student Services Fee;[2] Technology Fee; and Health Services Fee.  ECF No. 71 at 11-13.  At the motion to dismiss stage, the Court dismissed Plaintiffs' claims for a tuition refund but let their claims to recover various fees proceed.  *Burt*, 523 F. Supp. 3d at 228.  Defendants now claim that, after discovery, the evidence does not sufficiently demonstrate that URI's Student Catalog made specific enough promises that these fees guaranteed exclusively in-person experiences.  ECF No. 69-1 at 5.

## II.   STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure controls in deciding whether a party is entitled to summary judgment.  Fed. R. Civ. P. 56.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*  More particularly,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

---

[1] These two cases against URI were initially filed separately but have since been consolidated.  Accordingly, the citations to the original complaints that follow this sentence list the original docket numbers in parentheses.

[2] While the Student Activity Fee is technically a separate fee for some students like Plaintiff Burt, the Court reviews it as a subset of the Student Services Fee for ease of analysis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When deciding whether the Court should grant summary judgment, the Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Rsch. Corp.*, 63 F.3d 32, 36 (1st Cir. 1995). As alluded to, there must first be no genuine issues of material fact. "[M]ere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Thus, the issue must be genuine and material. *See id.* "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party . . . . '[M]aterial' means that the fact is one that might affect the outcome of the suit under the governing law." *Morris v. Gov't Dev. Bank of P.R.*, 27 F.3d 746, 748 (1st Cir. 1994) (citations omitted) (internal quotation marks omitted).

Additionally, the moving party must be entitled to judgment as a matter of law. The moving party is "entitled to a judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323 (citations omitted) (internal quotation marks omitted). The Court decides this latter element of the summary judgment standard by evaluating "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon

whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 252 (alteration in original) (emphasis in original) (citations omitted) (internal quotation marks omitted).

## III.   DISCUSSION

URI makes three main arguments in support of summary judgment. *See* ECF No. 69-1 at 14-24. *First*, URI argues that its catalog did not promise that payment of these fees would entitle students to specific on-campus activities or services. *Id.* at 16-18. *Second*, URI argues that its refund policy expressly negates any refunds of fees to which students might otherwise be entitled. *Id.* at 18-19. *Third*, URI argues that, even if it did breach its contract with students, the contract would be unenforceable under the doctrines of impossibility and frustration. *Id.* at 23-24. The Court considers each argument in turn.

### A. The Student Catalog and Specific On-Campus Activities or Services

Under Rhode Island law, a contract exists between a student and her university based on the "reasonable expectations" created by the language found in documents such as the student handbook. *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007) (citations omitted); *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 34-35 (R.I. 2004) (citations omitted). URI primarily contends that these materials represent only that these fees would be used to support the various services mentioned, not that these fees were paid in exchange for access to specific in-person services. ECF No. 69-1 at 16-18. The University also contends that there are no representations that students were entitled to *exclusively* in-person services in exchange for payment of these fees. ECF No. 73 at 6-8. The most relevant document

4

is URI's Student Catalog, which contains statements about the various fees. *See* ECF No. 69-5, Ex. A (hereinafter "URI Catalog"). The Court will thus examine these representations related to each fee at issue.

### 1. Student Services Fee

The Student Catalog states that, "[t]he student services fee covers the cost of the Memorial Union, transportation, Fitness and Wellness Center, and capital projects. The undergraduate [student services] fee supports funds that are distributed to the Student Senate for a wide variety of student programs and activities." *Id.* at 14. As URI notes, the key language here is that the fee "*covers* the cost of the Memorial Union, transportation, Fitness and Wellness Center, and capital projects . . . . [And] *supports* . . . a wide variety of student programs and activities." *Id.* (emphasis added). While the first sentence in the quote refers to specific campus amenities, the latter sentence does not carry such specificity. The relevant question thus becomes whether this statement creates a reasonable expectation that this fee will be put toward campus uses to which students would have expected to have in-person access throughout the entire semester. Plaintiffs argue that these documents make specific mentions of facilities, such as the Anna Fascitelli Fitness & Wellness Center (collectively, with the other athletic facilities, the "Fitness Center") and Memorial Union, which create a reasonable expectation that payment of this fee permits them access to such facilities throughout the semester. ECF No. 71 at 11, 15. URI counters that these fees did go toward student activities—albeit virtual activities in some cases—for which they were intended. ECF No. 69-3 at ¶¶ 17-18.

URI also notes that its materials suggest only that the fee would *cover* the costs of these physical facilities, not guarantee students in-person access to them. *See* URI Catalog at 14 (using the broader language of "covers" and "supports"). Further, even if there were a reasonable expectation of in-person services, URI submits that there can be no reasonable expectation that it would provide these services exclusively in-person throughout the semester. ECF No. 73 at 6-8.

As an initial matter, the evidence undisputedly shows that URI put the funds from the Student Activity Fee[3] toward various student activities. *See, e.g.,* ECF No. 69-4, Exs. A, B (providing evidence of virtual events that URI held for student entertainment). These uses might be seen as "student programs and activities." URI Catalog at 14. For example, magician and URI alum, Mat Franco, performed virtually for the student body. *Id.,* Ex. A. Actor Will Ferrell and writer, director, and producer Judd Apatow also had appeared virtually before students. *Id.,* Ex. B. Before the COVID-19 pandemic, it would not have been unthinkable to have any random few guests (e.g., not a graduation speaker or guest of other such magnitude) appear virtually for various reasons such as scheduling. Moreover, URI—and through the Student Senate with respect to the disbursement of funds from the Student Activity Fee—retains discretion as to how it chooses to provide services. *See, e.g., Ambrose v. New England Ass'n of Schs. & Colls., Inc.,* 252 F.3d 488, 499 (1st Cir. 2001) (explaining that "policy concerns [in this type of case] include the lack of a satisfactory

---

[3] This fee was billed separately to Plaintiff Thomson, and thus was not technically part of the Student Services Fee for him. *See supra* note 2.

standard of care by which to evaluate educators' professional judgments and the patent undesirability of having courts attempt to assess the efficacy of the operations of academic institutions").   Because it still provided similar services, URI's discretionary use of these funds was therefore reasonable.

Additionally, "[t]hroughout the Spring 2020 semester, the University did continue to utilize Transportation Fee funding to cover the costs of parking enforcement, parking infrastructure maintenance and improvements, debt service for related projects, and reserves for planned projects." ECF No. 69-6 at ¶ 5.  Therefore, "the only anticipated expense to be covered by the Transportation Fee that changed was the shuttle service." *Id.* Regarding campus shuttles, URI claims that it reduced, but did not eliminate, this service a few weeks earlier than it normally would have. *Id.* Plaintiffs have demonstrated no specific harm from this reduced service.  If there had been reduced service for maintenance on some shuttles, surely Plaintiffs would not have a viable contract claim for such an ordinary occurrence.   There is a reasonable expectation that any number of random issues, such as mechanical failures, might limit—or even eliminate—shuttle service for short periods throughout the semester.  The Court thus fails to see the analytical distinction between an ordinary service outage as posited above and the reduced service here.  Plaintiffs have failed to show that the reduced service because of the COVID-19 pandemic was beyond what might occur in the ordinary course of operations.  The Court thus finds that URI has met its factual burden to warrant summary judgment on claims for all

the sub-fees of the Student Services Fee, except the Memorial Union and Fitness & Wellness Center Fees, which are discussed in the following paragraphs.

The real dispute here seems to concern the availability of certain physical facilities, such as the Fitness Center and the Memorial Union, whose amenities URI's documents mentioned by name but access to which was prohibited during the COVID-19 pandemic. *See, e.g.*, ECF Nos. 71-3 at ¶¶ 7-8, 71-4 at ¶¶ 7, 10 (claiming loss of access to these buildings); URI Catalog at 14 (naming such amenities). In other words, the issue is what work the phrase "covers the cost of the Memorial Union, transportation, Fitness and Wellness Center, and capital projects" does in this contract. URI Catalog at 14. As other district courts have alluded to, there is a salient difference between language that states that a fee "covers" or "supports" an amenity and language that states that a fee is paid in exchange for access to an amenity. *See, e.g.*, *In re Boston Univ. COVID-19 Refund Litig.*, 511 F. Supp. 3d 20, 24 (D. Mass. 2021); *Chong v. Northeastern Univ.*, No. 20-10844-RGS, 2020 WL 7338499, at *3-4 (D. Mass. Dec. 14, 2020). The broader "covers" and "supports" language in URI's Student Catalog suggests only a generalized use for the funds from such fees. *In re Boston Univ.*, 511 F. Supp. 3d at 24. This proposition is especially true when such broad language is followed by a mention of the Building/Capital Improvement Fee, in exchange for which there would be no expectation of receiving access to some specific physical building or service. *See* URI Catalog at 14. Plaintiffs seem to recognize this weakness in their argument and respond with the fact that these specific mentions of certain physical facilities create a reasonable expectation

that students could use them, which is possible only if URI grants them physical access. *See* ECF No. 71 at 9-11, 15-17.  For example, the Student Catalog states the following:

> The University has a number of other facilities for recreation. Mackal Field House contains fitness rooms complete with weight training and cardio equipment, a Mondo 200-meter track, and four basketball courts.  * * *  The Tootell Physical Education Complex offers an aquatic center with competitive and instructional programs; and a group exercise studio.  * * *  The Anna Fascitelli Fitness and Wellness Center is a 33,000 square foot two-level facility that opened in 2013. The Fascitelli Center includes 3 group exercise studios, cardio and strength equipment, and the Wellness Resource Center.

URI Catalog at 31.  Such detailed descriptions of the facilities and amenities that URI offers provide a student with more than a reasonable expectation that she could use them in person.  URI cleverly counters that Plaintiffs have not shown that they were entitled to *exclusively* in-person access.[4]  ECF No. 73 at 6-8.  To be sure, if Plaintiffs had had in-person access for only a short time during the semester, that might be a trivial enough period to effectively constitute a full-semester closure. But Plaintiffs had in-person access to these facilities for much of the semester. *See* ECF Nos. 71-3 at ¶ 8, 71-4 at ¶¶ 9-10.

The resolution of this debate thus turns on which party's argument best conforms to these facts.  On these factual issues, the record is not entirely clear.

---

[4] However, in at least one instance, the Student Catalog employs language like this: "The Bradford R. Boss Arena is one of only two ice facilities in the state that operate for the *entire year and are open for public skating.*" *Id.* (emphasis added). The Court finds it strenuous to see how a student could expect anything less than in-person access to this facility for the entire semester, given this explicit language combined with the fact that one cannot virtually skate at this ice rink.

Access to these physical buildings appears limited, but it is not apparent to what extent. *See, e.g.*, ECF No. 69-7, Ex. C at 40-77[5] (appending a deposition transcript with exchanges that discuss physical access to the Memorial Union and Fitness Center). For example, it seems that, under limited circumstances, students who were on campus could visit the mail room—and possibly the bookstore—in-person. *Id.* at 51-56. However, other activities that normally convened in the Memorial Union and required larger group gatherings, such as Student Senate meetings, had to be conducted virtually. *Id.* at 57-59. Additionally, some aquatic activities that would have normally convened at the Fitness Center moved to Rhode Island's coastal waters. *Id.* at 68. Further, there seem to be times where the Fitness Center's physical location was closed entirely. *Id.* at 68-71.

The evidence does not clearly vindicate URI's position that the relevant materials made no promises for specific in-person services. And as this Court ruled at the motion to dismiss stage, these materials alone were insufficiently clear to warrant dismissal. *See Burt*, 523 F. Supp. 3d at 223-24. While the various declarations and depositions discuss the services that these fees fund, the whole of the evidence leaves genuine issues of material fact about what a student's reasonable expectation of these fees might be and whether URI met these expectations. There is enough of a suggestion that a student might reasonably expect to have in-person access to these services for enough of the semester (i.e., even if the reasonable

---

[5] Because this exhibit does not include all the pages of the transcript, cites to the exhibit refer to the pagination of the entire ECF document.

expectation had not been exclusively in-person access, the expectation was still to have in-person access for longer than students did in the spring of 2020) to survive summary judgment on this basis.   Given the record before it, the Court thus finds that the resolution of whether URI breached its contract regarding these two fees (the Memorial Union and Fitness & Wellness Center Fees) would be best left to the experience of a jury—but the Court grants summary judgment for URI on these claims on other grounds, *infra* Part III.C.[6]

### 2.   Technology Fee

Much like the language of the Student Services Fee, the Student Catalog broadly states that "[t]he technology fee covers the cost of various University technology expenses." URI Catalog at 14.   Unlike the language of the Student Services Fee, this language does not even mention specific technologies or services that URI provides.   That the fee covers "various . . . technology expenses" suggests no particular benefit, let alone access to specific physical facilities.   *Id.*; *see also* ECF No. 69-6 at ¶ 10 ("The Technology Fee is not used for any specific technology items or services.   Rather, it is used . . . to provide services to students and . . . to support [the] student community with contemporary technological resources.").   URI demonstrated that the funds from this fee were put toward technology for classes and other

---

[6] URI's argument that Plaintiffs fail to show damages is also unconvincing. Plaintiffs adduced specific fees that they paid for the semester in exchange for specific services that they did not receive (assuming that they prevail on the previous questions and reach the damages question).   Accordingly, Plaintiffs could receive a refund of those fees corresponding to the percentage of the semester that they did not receive these services.

educational functions consistent with past practice. *See* ECF No. 69-6 at ¶ 12 (noting these uses).  While the extra expenses of hosting virtual classes have never been a consideration, such a use of funds is certainly keeping within the reasonable expectations of their use.  Nor have Plaintiffs adduced sufficient evidence that they had a reasonable expectation that they could use specific physical facilities, such as computer labs.  Such a benefit is only discussed in passing among many other uses. This situation contrasts with the Student Services Fee, which contemplates specifically named physical facilities.  The generalized expectation that a university would provide physical computer lab access to a student is too broad a ground on which to rest legal contractual claims given the inherent discretion afforded to educational institutions. *See, e.g., Ambrose* 252 F.3d at 499 (noting that educational institutions retain much discretion in how they provide services to students).  There is nothing in URI's materials that sets this expectation in a more concrete form.  The Court thus finds that URI has met its burden to warrant summary judgment on claims for the Technology Fee.

### 3.    Health Services Fee

The Student Catalog states that "[t]he health fee covers the cost of * * * routine office visits with URI staff providers * * * ambulance/emergency transport services * * * pharmacy [i.e., medications] * * * [and] administrative services provided at Health Services, and health education."  URI Catalog at 14.  The "pharmacy" portion is a non-issue, as that refers only to the cost of medications, which students continued to receive.  Likewise, "health education" does not necessarily imply an in-person service.

Education could mean any number of things, from information on a website to identifying particular persons whom students could contact. Plaintiffs have adduced no evidence that they had a reasonable expectation of in-person, informational sessions on health-related topics. Emergency transport services might be expected on campus but not elsewhere off campus. And while Plaintiffs might not have needed them as they remained off campus, they make no factual showing that, were they on campus, they would not have been provided such services. While "administrative services provided at Health Services" might imply services that are provided at the physical, on-campus location, it does not necessarily imply something to which students would have access. Because administrative functions generally support the main functions of an office—treatment by physicians in this case—Plaintiffs have proffered no evidence that students would be entitled to some sort of physical, in-person administrative service. The expectation, if any, is that a student would be seen in-person by a physician.

As for physician appointments, URI asserts that it continued to provide medical care to students, including in-person office visits when needed. ECF No. 69-3 at ¶ 14 ("URI Student Health Services provided . . . in-person office visits for such things as injections, physical exams, treatment of injuries, EKGs, ob/gyn appointments, and pharmacy visits."). It is true that nearly half the appointments (1,182 of 2,474) that URI claims it provided were conducted by telephone. *Id.* However, Plaintiffs do not make specific allegations—nor do they adduce specific facts—that they were denied particular in-person medical services. Plaintiffs only

13

assert that they were "not able to seek basic on-campus health and treatment services." ECF Nos. 71-3 at ¶ 12 (Plaintiff Burt), 71-4 at ¶ 10 (Plaintiff Thomson). Plaintiffs have proffered nothing to contradict the specific facts that URI has adduced, which would be necessary to show a genuine issue of material fact on this claim. *See Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009) (citation omitted) ("Once the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer 'definite, competent evidence to rebut the motion.'"); *Welch v. Ciampa*, 542 F.3d 927, 935 (1st Cir. 2008) (noting that a plaintiff must rely on more than "'conclusory allegations'" to overcome summary judgment). The Court thus finds that URI has met its burden to warrant summary judgment on claims for the Health Services Fee.

### B. URI's Refund Policy

URI additionally argues that its refund policy negates any claim to a refund after the fifth week, and thus regardless of the above analysis, Plaintiffs have specifically contracted out of any ability to receive a refund. ECF No. 69-1 at 18-19. In response, Plaintiffs argue that the refund policy only deals with situations in which a student drops or withdraws from a class.[7] ECF No. 71 at 13-14. As part of the

---

[7] Plaintiffs also might have a second argument that the refund policy is irrelevant because damages for breach of contract do not constitute a "refund" or "reduction in amounts due" within the meaning of URI's policy. But this argument rests on feeble footing as Plaintiffs only specifically seek "disgorge[ment of] amounts wrongfully obtained for . . . fees." ECF No. 22 (20-295) at 35. Or, "disgorge[ment of] unearned moneys," as the other complaint phrases it. ECF No. 1 (20-465) at 11. Because disgorgement is an equitable remedy predicated on return of monies unjustly obtained, it sure sounds a lot like a refund in this case. *See In re Evangelist*, 760 F.2d 27, 29-30 (1st Cir. 1985) (holding that a party seeking disgorgement is not

14

Financial Responsibility Agreement, which both named Plaintiffs signed, a student agrees that she "accept[s] full responsibility to pay all . . . fees . . . assessed as a result of [her] registration . . . . [And she has] read the terms and conditions of the published tuition refund schedule." ECF No. 69-5, Ex. E at 1. In the Student Catalog, the refund policy states that "[r]efunds of payments made or reductions in amounts due to the University shall be made to students who officially withdraw or take a leave of absence according to the following scale . . . ." URI Catalog at 16. The scale (the refund schedule) that is later explained undisputedly states that no refunds will be given after completion of the fifth week of classes. *See id.*

That said, nowhere does the refund schedule in the Student Catalog or on URI's website state that no refunds will be given after the fifth week *for any reason*, despite the understanding of certain university administrators. The refund schedule online states in bold and all capitals that "TUITION AND FEES ARE REDUCED ACCORDING TO THE FOLLOWING SCALE UPON WITHDRAWAL OR LEAVE." ECF No. 69-5, Ex. D at 2 (capitalization in original) (emphasis removed). There is a clear modifier that a student must withdraw from a course or take a leave of absence from the University. Likewise, the quoted language from the Student Catalog requires that "[r]efunds of payments *or* reductions in amounts . . . shall be made to

---

entitled to trial by jury because this remedy is equitable). Only Plaintiff Thomson makes passing mentions of legal damages. *See* ECF No. 22 (20-295) at ¶¶ 115, 145. Both Plaintiffs also include boiler plate language that requests such other relief that is "just and proper." *Id.* at 35; ECF No. 1 (20-465) at 11. In any event, because the Court finds the refund policy inapplicable in this case, it need not rule on this alternative ground.

*students who officially withdraw or take a leave of absence*." URI Catalog at 16 (emphasis added). There is once again a modifier that requires the student to withdraw from a course or take a leave absence. And to say that the withdrawal or leave part of the sentence only applies to the "reductions in amount" language would be a strained reading of that sentence. When there is an "or" conjunction the most natural reading of such sentence is to attribute subsequent language to both sides of the conjunction. *See Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169-70 (2021) (for a statute "using the word 'or' to connect two verbs that share a common direct object, 'telephone numbers to be called[,]' [i]t would be odd to apply the modifier ('using a random or sequential number generator') to only a portion of this cohesive preceding clause"). Accordingly, the Court finds that the text of the refund policy makes it inapplicable in this case because it only applies to students who withdraw from a course or take a leave of absence, which neither Plaintiff has done.

### C. Impossibility and Frustration

"A venerable legal Latinism, *lex non cogit ad impossibilia*, teaches that the law does not compel the impossible." *In re Grand Jury Proceedings*, 744 F.3d 211, 212 (1st Cir. 2014). Or, perhaps more accurately in this case, the law does not compel the illegal. Accordingly, URI alternatively argues that its performance should be excused under the doctrines of impossibility and frustration. ECF No. 69-1 at 23-24. URI contends that it could not provide in-person, on-campus services because doing so would force it to violate multiple directives from then-Governor of Rhode Island Gina Raimondo. *Id.* (quoting, *inter alia*, R.I. Exec. Order No. 20-14 ("All Rhode Island

residents are required to stay home unless traveling to work, traveling for medical treatment[,] or obtaining necessities (food, medicine, gas, etc.) . . . . [And] all non-critical retail businesses shall cease in-person operations . . . .")). URI would thus not be able to operate the Fitness Center and Memorial Union without violating multiple provisions of these orders.  Plaintiffs dispute that the necessary conditions for these defenses have been satisfied.  Plaintiffs further argue that, even if these conditions were met, they should still be able to recover under a quasi-contractual theory of liability.  The Court considers each defense and Plaintiffs' response in turn.

### 1. Frustration

It would be, at bottom, highly impracticable—but perhaps not impossible—to operate these facilities with the necessary staff present while limiting the number of persons who could gather to five (or even twenty-five in many cases).  Accordingly, URI argues that the five-person gathering limit frustrated the purpose of the parties' contract by prohibiting the very activities that students might have reasonably expected to attend. *Id.* at 24.  Under Rhode Island law, the elements of a frustration defense are: "(1) the contract is partially executory, (2) a supervening event occurred after the contract was made, (3) the non[-]occurrence of the event was a basic assumption on which the contract was made, (4) the occurrence frustrated the parties' principal purpose for the contract, [and] (5) the frustration was substantial." *Iannuccillo v. Material Sand & Stone Corp.*, 713 A.2d 1234, 1238 (R.I. 1998) (citation omitted).  Because the Court has found that there are genuine issues of material fact as to whether URI breached its contract with students, the same finding covers

whether the contract was partially executed. *See supra* Part III.A.1. The first factor

of the test for frustration is thus satisfied. The supervening event was the onset of

the COVID-19 Pandemic that precipitated then-Governor Raimondo's executive

orders. The third condition is the subject of Plaintiffs' response, and thus is discussed

below. *See infra* Part III.C.3 (finding for URI on this issue). The remaining question

is whether the principal purpose of the contract—assuming for the moment that

Plaintiffs prevail on their claims to recover fees—was substantially frustrated.

Many student events by necessity require more than five persons to occur in

any meaningful form (e.g., a Student Senate meeting). It, therefore, might be possible

to hold smaller group meetings for student organizations, but the Memorial Union's

purpose of housing these student organizations would be substantially frustrated by

limiting the size of their in-person gatherings. In other words, to serve many of their

purposes, such as communal interaction, clubs cannot meet only in five-person

cohorts. *See, e.g.*, URI Catalog at 28 (emphasis added) ("[T]he Memorial Union

houses a wide variety of social, educational, cultural, travel, and recreational services

and facilities . . . . These services include *meeting* and *conference rooms*, lounges,

study spaces, radio station and student newspaper, offices for student organizations

. . . and *larger meeting and performance spaces*."). Other uses of these facilities,

however, may not necessarily require larger group gatherings. For example, a

student may just want to use exercise equipment in the Fitness Center by herself. It

thus may be possible to have only a few students using the Fitness Center at a time.

But it would surely be a challenge to figure out the logistics of such with a student

body of greater than 10,000. Again, even if URI had designed a system where only a few students at a time used the Fitness Center—e.g., through some sort of first-come, first-served signup sheet—such a system would defeat the purposes of "provid[ing] diverse experiences [that] enhance the quality of campus life through recreational opportunities . . . . [And] foster[ing] student success through engagement, collaborative learning experiences and embracing individual interests and values that inspire a sense of belonging." *Id.* at 30. The Court thus finds that URI has met its burden in showing that the purpose of its (presumptive) contract with its students for use of the Fitness Center and Memorial Union was substantially frustrated by then-Governor Raimondo's executive orders.

### 2. Impossibility

To the extent that URI intended the Memorial Union (*see id.* at 28)—and to a lesser extent the Fitness Center[8]—to serve as an in-person location where students could gather and interact, that use would *not* have been possible under the state executive order. R.I. Exec. Order No. 20-14. Further, students were required to stay home unless traveling to work, for medical care, or for necessities. *Id.* Plaintiffs thus would have been prohibited by law from using these physical facilities unless they were engaging in activities like purchasing necessities from the campus store (a suggestion for which there is no evidence). *Id.* Accordingly, it would have been impossible for URI to perform its obligations under the contract for the latter part of

---

[8] For example, the Student Catalog advertises the Fitness Center's three group exercise studios, whose use almost certainly contemplates groups of more than five persons. *See id.* at 31.

the spring 2020 semester. And because the contract only contemplated a student-university relationship for the spring 2020 semester, the underlying purposes were "totally and unforeseeably destroyed" because they became illegal. *Iannuccillo*, 713 A.2d at 1238 (internal quotation marks omitted) (quoting *City of Warwick v. Boeng Corp.*, 472 A.2d 1214, 1219 (R.I. 1984)). In other words, performance was permanently impossible because obligations under a contract that contemplates performance specifically during the spring 2020 semester cannot be performed at some other time. *See Cinquegrano v. T.A. Clarke Motors, Inc.*, 30 A.2d 859, 862 (1943) (distinguishing governmental orders that make performance illegal for a limited period from those that make the object of the contract entirely illegal).

### 3. Plaintiffs' Responses and Theory of Quasi-Contract

Plaintiffs counter that URI has failed to show the occurrence of an event whose non-occurrence was a basic assumption underlying the contract. ECF No. 71 at 17-18. In their brief, Plaintiffs use a quote that refers to the defense of *impracticability*, instead of *impossibility* (or frustration), even though the case to which they cite specifically distinguishes these doctrines. *Compare* ECF No. 71 at 17-18 (internal quotation marks omitted) (quoting *Iannuccillo*, 713 A.2d at 1238) ("A party's performance under a contract is rendered impracticable . . . ."), *with* ECF No. 69-1 at 23-24 ("[W]ell-established principles of impossibility . . . bar their contract claims."). "Where the outcome of a case could pivot on application of the term impossible—contrasted with the broader word impracticable—then the reader is urged to study the actual text of the cited case." 30 WILLISTON ON CONTRACTS § 77:1

(4th ed. May 2022 Update) (citations omitted).  To be fair, there is much overlap between these terms, and they are not always used with clarity. *Cf. id.* ("The law of impossibility, which excuses what would otherwise be a breach of contract, has evolved into a broader and more equitable rule of impracticability, and impracticability of performance may excuse a party from performing contractual obligations.").

Moreover, the standard for impracticability from the case that Plaintiffs cite tends to favor URI's position. *See Iannuuccillo*, 713 A.2d at 1238 ("[D]efendants' impossibility argument . . . does not support the extent of relief [Defendant] Pezza seeks—complete absolution of responsibility under the contract. * * * [D]efendants fare better in their related argument that the discovery of the ledge made impracticable any further performance on its part . . . ."). Whatever the state of affairs may be, the defense of impossibility has required the same condition as impracticability to be met. *Grady v. Grady*, 504 A.2d 444, 447 (1986) (citations omitted) ("The ultimate inquiry then for the purposes of accepting or rejecting a defense of impossibility is whether the intervening changes in circumstances were so unforeseeable that the risk of increased difficulty or expense should not be properly borne by [Defendant]."). URI's claim that complying with the contract would require it to violate governmental orders could also be read as invoking a defense that the Restatement (Second) of Contracts calls "prevention by governmental regulation or order," which also requires the same condition as impracticability and impossibility to be met. REST. (SECOND) OF CONTRACTS § 264 (Am. L. Inst. Oct. 2022 Update) ("If

the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made.").

In any event, it is apparent from the record that neither party would have contemplated a global pandemic that required all non-essential in-person operations to cease.  For example, before the start of the COVID-19 pandemic, the University was not equipped to broadly teach classes in at least a partially remote format.  ECF No. 69-7, Ex. E at 149 (noting that this change "was an initiative specifically related to the pandemic").  Having the ability to teach classes remotely might serve as a beneficial educational tool, even setting aside a pandemic.  But, given that the University only developed and implemented this feature after the COVID-19 pandemic struck (*see id.* at 149-50), the Court finds that representations like this one are sufficient evidence that URI did not contemplate a global health crisis.  And in fact, one former URI administrator even specifically noted the novelty of such a scenario and how the University did not anticipate it at all.  *See id.,* Ex. C at 38-39 ("The university, like you and many others, was responding to a global pandemic. I've never been in a pandemic before.  This was my first one, likely yours.").  The Court thus finds that URI's performance under the contract is excused under a combination of the doctrines of impossibility and frustration.

Finally, Plaintiffs argue that, even if URI has met the high burden on its affirmative defenses of impossibility and frustration, they should still be able to

recover under an independent claim of unjust enrichment.[9] ECF No. 71 at 18-19. Underlying this argument seems to be the notion that, because URI is the party that can more efficiently absorb the risk of unexpected events, it should bear the financial burden of it. *Id.* at 16 ("There is no reason to force Plaintiffs to bear the financial burden from Defendant's inability to provide agreed to in-person services as specified in the Fees collected—if Defendant had wanted it that way, it could have written its contract in such manner."). Yet this premise directly contradicts that of the doctrines of impossibility and frustration. *See Tri-Town Constr. Co. v. Com. Park Assocs. 12, LLC*, 139 A.3d 467, 476 (R.I. 2016) (citation omitted) (noting that the defense of frustration of purpose provides "that the risk of increased difficulty or expense should not be properly borne by" a defendant specifically because such risk was so unforeseeable); *Grady*, 504 A.2d at 447 (noting the same for the defense of impossibility).

Under Rhode Island law, "[t]o recover for unjust enrichment, a claimant must prove: (1) that he or she conferred a benefit upon the party from whom relief is sought; (2) that the recipient appreciated the benefit; and (3) that the recipient accepted the benefit under such circumstances that it would be inequitable for [the recipient] to retain the benefit without paying the value thereof." *IDC Clambakes, Inc. v. Carney*, 246 A.3d 927, 933 (R.I. 2021) (alteration in original) (citation omitted). Plaintiffs

---

[9] While the Court dismissed Plaintiffs claim of unjust enrichment (*Burt*, 523 F. Supp. 3d at 228), it assumes for purposes of this discussion that either it would reinstate the claim, or it would construe the remaining claims as claims of unjust enrichment to best promote equity. *See* ECF No. 71 at 19 (arguing for these two options if the Court found URI's performance impossible).

23

claimed that they paid for in-person services but were only provided with lesser quality virtual services. ECF No. 71 at 18 (quoting *Arredondo v. Univ. of La Verne*, No. 220CV07665MCSRAO, 2022 WL 3222376, at \*5 (C.D. Cal. Aug. 2, 2022) ("It would be unjust to allow Defendant to retain the benefits of offering in-person services when it did not offer in-person services, even though that performance was impossible.")). But the record shows that URI used the funds from the remaining fees (the Memorial Union and Fitness & Wellness Center Fees) to provide virtual services, such as workout classes and entertainment, to students. *See supra* Part III.A.1.

Plaintiffs cannot maintain a claim for unjust enrichment where URI has provided services in an alternative form, and thus retaining little, if any, of the benefit that it was conferred (allegedly in exchange for provision of the superior in-person services). As another district court aptly phrased the point, a "school cannot be liable for restitution unless going online enriched it. If online classes cost the school as much or more than in-person classes would have, then it was never enriched at all." *Ninivaggi v. Univ. of Del.*, 555 F. Supp. 3d 44, 53 (D. Del. 2021). Nevertheless, the Court will not require a formal accounting of the fees at issue. While a complete accounting of expenditures funded by these fees would help, it might not necessarily settle the issue as the parties could still dispute the accounting process. And in any event, there is ample evidence in the record to suggest that URI did not "pocket" the funds from these fees. *See supra* Part III.A.1. Moreover, Plaintiffs do not point to specific evidence that would indicate that URI actually profited from these fees when it transitioned to online learning, instead of using them to fund services that it

24

offered. *See Meuser*, 564 F.3d at 515 (citation omitted) (holding that "the non-moving party must offer 'definite, competent evidence to rebut the motion.'"). Accordingly, Plaintiffs claim fails the third prong of the above legal test for unjust enrichment because Plaintiffs have failed to demonstrate that URI retained any sort of meaningful benefit in such an inequitable manner as to warrant recovery. *See Carney*, 246 A.3d at 933 (alteration in original) (citation omitted) (requiring "that the recipient accepted the benefit under such circumstances that it would be inequitable for [the recipient] to retain the benefit without paying the value thereof"). Plaintiffs have failed to adduce genuine and material factual issues that they are equitably entitled to relief, given the University's expenditures on services and amenities in alternative forms. Such a claim, instead, would have to rest on breach of contract under the theory that URI did not provide the services for which Plaintiffs contracted. But this breach of contract theory fails for the reasons already explained. The Court thus finds that Plaintiffs cannot state an independent claim for unjust enrichment.

## IV. CONCLUSION

For these reasons, the Court GRANTS URI's Motion for Summary Judgment. ECF No. 69.

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court

January 31, 2023